Good morning, Your Honor. My name is Jim Van Ness. I'm here on behalf of Joseph Pauly. May it please the Court. This case was decided on summary judgment. In the District Court, Mr. Pauly had brought eight claims. The Court granted summary judgment as to seven of those claims and remanded one of the claims. In part, it remanded three of the claims that asserted statutory interpretation to the National Appeals Division, and I believe the language was, to the extent they have the authority to do so. 7 CFR 11.8 prohibits the National Appeals Division from engaging in any type of statutory interpretation, so we have treated it as a dismissal of all seven claims with a remand only of the eighth claim, which is the value of the improvements. In 1989, this Court in Watkins v. United States Army set forth the standard by which equitable estoppel claims against the United States government are analyzed. One of the failings in the District Court's decision is that they did not look to Watkins as the source of the analysis. This Court in Watkins recognized that any type of analysis is intensive and fact-based. The District Court instead embraced a seven- bound up in its special facts. The law has been for longer than I have been a lawyer, for much longer than I have been a lawyer, that you cannot have estoppel against the government unless you have a affirmative misconduct. And there are any number of cases out there with harsh results, starting with poor Mr. Merrill back in 1943 or 38 or whenever his actual facts were, when the government told him, yes, go ahead, grow winter wheat, we encourage you to do it. And he did exactly what he was told, and then he got socked with penalties. I can't see where your case is any better than Mr. Merrill's. Well, let me explain why it's better. The District Court looked at the facts in Pauley and adopted the reasoning in Israel and found the cases analogous when, in fact, they're not. This Court has recognized that a single oral misstatement is insufficient. And, in fact, that's what the District Court found, that there was a single oral misstatement. It ignored the record that Mr. Pauley, in the spring of 1989, received a package from the Farm Service Administration notifying him of the availability of loan servicing. This package is some 300 pages long and contained a statement, you may need to seek legal advice to complete this. We were in a serious agriculture depression at that time. There's no money for attorneys. What did they do? They sought the advice of their local supervisor. Over a period of six months, Mr. Pauley met with Mr. Coons repeatedly. They sought the supervisor being the government guy. That's correct. I'm sorry. Sort of like the guy who told Mr. Merrill, go ahead and grow winter wheat. But there's more facts than that. But it's kind of analogous. He talked to the local government agent all about this problem, and instead of getting a lawyer like they told him, he decided he's going to get his advice from a government employee. That is correct, Your Honor. He did that. He also sought advice from their state office, which was the highest level of employee within the agency that he could have direct contact with. But he was supposed to get a lawyer, right? No. No, he said he may seek advice of an attorney. But it would be helpful. I mean, I realized that this went on over a period of time. He went to the government thinking, if you can't get the right answer from the government, who are you going to get it from? But that begs the question of what was the government misconduct that, in your view, could bring this under the estoppel theory? The government's misconduct was that the supervisors themselves and outsiders like Mr. Pauley, and inevitably his attorney, did seek counsel from the state office. If I may digress just a minute. What's the government misconduct? That's what I'm getting to. I just wanted to lay out the hierarchy. There's county-level employees, the state office. Why should Cut to the Chase tell us what the misconduct is? The misconduct was the state office employees directed the county office employees for the purpose of expediting these agreements to get them cleared off the dockets. There's thousands of them pending. To get them cleared off the dockets. What was the misconduct? The misconduct was to tell them that there would be no recapture when, according to the government's briefs, they knew. How is it any different than the guy who told Mr. Merrill grow winter wheat? I don't believe in Merrill that there was any evidence to support that the supervisor, through just mere negligence, just said it on his own, versus agency-wide that this was promulgated, this myth was promulgated. It seems to me the problem is they were just wrong. I mean, I don't think that what I'm having trouble with is understanding any evidence of affirmative misconduct as opposed to affirmative stupidity. If they were wrong, as the government contends, then we assert they had a duty to notice Mr. Pauly as soon as they knew they were wrong. Now, the government contends they knew it all along. I think the evidence is different than that. The state office farm program chief said it took seven years for them to get a letter to Mr. Pauly saying- But you're talking about duty. They had a duty. The question is where's the affirmative misconduct? Affirmative misconduct- Deliberately snaring them into something, being aware that in the end they're going to get a different deal. There's no evidence of that at all. As opposed to mere government negligence. If the government's theory is correct that the state office and national office knew that there was recapture, the act of the state office directing the county office employees to tell their borrowers the opposite fact, to lie to their borrowers, is affirmative misconduct. This circuit has held that evidence of a single deliberate lie is affirmative misconduct. A pattern of false promises- What's the evidence that the people who talked, that there was a directed lie? Because in affidavits and testimony, that the state office at training sessions, at meetings, and through oral advice over the phone over this period, told the county supervisors to tell borrowers that there was no recapture if they stayed on the farm. What is the evidence that they, the people who were doing these things, knew that the opposite was true? According to the government's theory of the case, read the statute. The statute's unambiguous. It clearly calls for recapture. Well, but that's quite different from saying they knew and were telling the government lies. They may have been stupid. They may have been ignorant. But there's no evidence at all that they did this knowing this was wrong. They should have known, but so should your clients have known. Your clients can read the law. They're presumed to know the law. The evidence would exist in when the state office followed their chain of hand and went to their national office and presumably their attorneys. Nothing, nothing in that chain of command filtered back down to stop the lie. If they had a question. You call it a lie, and you're free to do that. You're a lawyer. You can characterize facts as you will. But you have provided no proof of any lie. You have simply provided proof of widespread government stupidity. And that's not a surprise. We know what happens. And the Supreme Court has specifically and repeatedly addressed this issue and says that the fact that they're wrong does not imply affirmative wrongdoing, and the government is not bound by the unauthorized act of the state. In fact, you can't run a government any other way. That's what the Supreme Court has said. I'm not convinced personally that you couldn't, but I know how to read. If the fact pattern is that the state office officials had a question whether what they were saying was truthful or not. You're speculating. You don't know. Correct. There's no evidence whatsoever of this. You can't create a case out of nothing by saying, Oh, well, I'm supposing they might have known. For all we know, the guy who gave advice to Mr. Merrill was, you know, chortling with his office mate, saying, Oh, I'm going to mislead this guy. I'm going to get him to grow winter wheat. We can speculate about that, too. But it's not good enough. Testimony at the oral argument from the highest level state employee. They don't usually have testimony at oral arguments. That's correct. It was an unusual proceeding. Did they put a witness on? Yes, they did. And so did the government? Yes, they did. Yes, they did. That was the question in front of the court, was where did this knowledge emanate from? And the highest level state employee advised, testified under oath, that he did seek advice from the state office immediately, that he was aware almost immediately that this advice was wrong. That's in the record. And so, in the end, they took no steps to come back down the ladder into the county office levels and direct those county supervisors not to continue to give this song and dance about there being no recapture. That's what we cite, too, as the evidence of affirmative misconduct. Now, let's say that you're right about that, or at least that there's a factual issue about that. The second half of estoppel means there has to be a serious injustice. But the net effect of everything is that they end up having to pay a debt they already owe. So why is that so terrible in the scheme of ordinary economic commerce? A couple of reasons. One of the business choices Mr. Pauly had to make at the time was whether to file a Chapter 12 bankruptcy or not, which would have given him the same provisions, debt write-down with no provision for recapture, even if these three conditions preceding it had been triggered. Moreover, there would have been no tax burden. Mr. Pauly and — Would he have kept his property? I'm sorry, Your Honor? Would he have kept his property? Yes, under Chapter 12. Yes, Your Honor. What would have happened is — Is there any reason he couldn't have filed a Chapter 12 at the conclusion of all this for today? Yes, and that's one of my arguments, is had he been advised sooner than seven years into this agreement — he was not advised until the agreement had fully matured, but had he been advised somewhere in the term of this agreement, he could have filed a Chapter 12 and rejected it as an executory contract. Again, the government did nothing to tell him that his — What would have been the consequence of rejecting it as an executory contract? Then there would have been no recapture. Well, but wasn't this — Wouldn't that have been stated in the earlier agreements which filed the write-downs? It would have worked like the earlier bet. No, it would not have. It would not have. The government has always bifurcated these issues. They have treated debt forgiveness as a final act. They send out a 1099 advising the farmer that he has received debt forgiveness under Section 108 of the IRS Code. It's taxable. Mr. Pawley paid tax on that. The government's theory is the shared appreciation agreement is a contract all by itself. They've entered into a partnership and said, we've given you debt forgiveness to allow you to stay on the farm. But doesn't the contract say this is in consideration for — that it's tied into the forgiveness of the debt and extinguishing the earlier agreement? No, the shared appreciation agreement only states the amount that was written down. It does not make any further reference outside the agreement to the reasons for the agreement. What's the consideration of your client's part? Well, that's a good question, Your Honor. And many courts have labored over that issue, and I'm not as wise as they are. Well, isn't the obvious answer is there was an agreement over here. The parties essentially did an ovation or a restructuring, and they extinguished this agreement, and they have a new agreement. If it turns out this agreement is void, I think you're back to the — Certainly the government could go back and say the consideration for having extinguished this contract is now gone. It is back in force. Isn't that how it would work? Well, but the other side of the injustice argument is that it isn't a question of just reinstating the $131,000, almost $132,000 that was written off. What about the income tax that's been paid on that? There's an injustice there. The debt was termed forgiven. Well, you don't have to file a — to the IRS for that. If there's not a forgiveness, then you file an amendment to your tax return. In effect, it's a reversal of an accounting reversal. Yeah, the IRS is — She knows what she talks about in tax law. The IRS has actually issued a rather interesting rev proc on that, and it doesn't go that far, but — She's a wizard when it comes to tax law, trust me. And I will defer to that. The other side — I would trust him on that, on other stuff. The other side to this is that Congress authorized the forgiveness of debt. There's no injustice or there's no burden to the government by simply not collecting. Out of 100,000 of these that were processed and written down, only about 12,000 ended up with shared appreciation agreements. Isn't this the kind of thing that ought to be dealt with by Congress? Obviously, there was a big goof here. The government was not at its best, even by the standards of government work. And isn't this the kind of thing that your clients ought to take to their senators and Congress people? And along with all those — You know, you just lost the whole class of 16,000 or some large number like that. This strikes me as a political problem, much more than a legal problem, something that you don't want to explain to Congress about. The farmers were supposed to be given relief, and in many ways the government fell down on the job. They made mistakes, they entered into agreements of debt, and they made misrepresentations, apparently, of various sorts, to incompetence or whatever, but it's a political problem, isn't it? And shouldn't this be pursued with Congress? Congress can do with a very small statute or a small addition to a large statute, or a small variance to a large statute, can just work wonders in these kind of areas. Isn't that going to be the solution? I would generally agree with that proposition, except when applied to this particular defendant, the FSA has had a long history of misinterpreting what were clear and unambiguous rules — laws promulgated by Congress. In fact, the 1987 Credit Act itself, some 900 pages long in the preamble, states just that, that because this agency has fumbled the ball so many times and clearly misinterpreted clear congressional intent, they spelled out the statute ad nauseum. Unless Congress was prepared to do that again, I don't know what relief is there. May I ask you a question about the shared appreciation agreement? I'm looking at Supplemental Excerpt of Record Page 12, and the paragraph next to the bottom says, as a condition to and in consideration of FMHA writing down the above amounts and restructuring the loan, borrower agrees to pay FMHA an amount according to one of the following payment. It appears the consideration for the agreement was the writing down. Am I misinterpreting this? No, you're not misinterpreting, but to segue in my remaining time, I've got one other issue I'd like to briefly touch on, and that is to go back to the statutory interpretation issues. And that is the agreement that you've referenced, and the regulations themselves, talk about three conditions precedent, that if one of those happens over the first five years, there's a 75 percent recapture. In the second five years, there's a 50 percent. And then it says the agreement expires. There's some question as to what it means by the agreement expires and whether recapture is due when the agreement expires. One of the things I touched on in my brief was the fact that we have this clear direction as to what happens, how to recapture within the conditions precedent, but the statute is absolutely silent on how to recapture if one is supposed to on its expiration. Isn't that the kind of thing, then, that the agency gets to make a call, and they get deference because if it's ambiguous, as you said, they get to decide? That's correct. But the agency has issued no clarification vis-à-vis a regulation. They don't have to. The agency can act through the adjudicative process, can act in various informal ways.  We've got half a minute. I'm sorry. What about Section 2001E3, which seems to suggest that recapture at the end of the term of the agreement would be 50 percent? And this reading is reinforced by the subsequent provision of the statute entitled time of recapture. Recapture shall take place at the end of the term of the agreement or sooner. Sooner were the three things that you were talking about, but it clearly says recapture shall take place at the end of the term of the agreement. Why is that ambiguous? All I'm repeating is what the court in Berkoski found was that the agreement, because of the grammatical construction of the sentences, when viewed from, I believe it was an English professor's viewpoint, that it was ambiguous. That was also put forth in the appeals that underlie this case as well, that the verbiage used in itself is ambiguous, and I would defer to the briefs on that. Thank you. Thank you. Thank you from the government. May it please the court. I'm Eric Miller from the Department of Justice on behalf of the U.S. Department of Agriculture. This court lacks appellate jurisdiction over the appeal brought by the polis because the order appealed from is not a final judgment under Section 1291. The order does not resolve all of the issues in this case. Instead, it directs the Secretary of Agriculture to conduct further proceedings on remand, specifically to reappraise the polis property and make a new calculation of their liability. We have jurisdiction over your appeal, though. That's correct, under the collateral order. It's really odd, isn't it? Yes, sir. It's really odd. We have jurisdiction over your appeal, which is of a nine-final order, but we don't have jurisdiction over their appeal or a final order. That's correct. It's sort of backwards, isn't it? It is, but there's a good reason for it, and that is that if the government is not permitted to appeal now, the order that it seeks review of would escape review because if the Secretary of Agriculture goes ahead with the remand and makes a new administrative decision, the government won't be able to appeal its own decision, whereas, on the other hand, at some point in this proceeding, the district court will eventually enter a final judgment. Let me explore this just a little bit. Let's say the administrator goes back, reconsiders his decision, or her decision, I forget what it is, but anyway, his decision, and decides, you know, the district court was wrong. We were right all along. Could it do that, or do you think the district court's order precludes that? I think it's compelled by the district court's remand order. So you read the district court's order as simply saying, go back and calculate. That's correct. Okay. And if they fail to do that, they'd be... They would be violated. Okay. Is this the first time that this has been contested? I noticed in the record it said there have been over 5,000 cases. Is this the first case where this has been contested? This retroactivity issue? Yes. It's the only one of which I'm aware, yes. That seems very strange. And, of course, on remand, we don't have anything in the record about what portion of the value of the poly's property is attributable to the improvements because that appraisal hasn't been done. So we don't know what the consequence of the reappraisal would be, but it is possible in principle that that could give the poly's some or all of the relief that they're seeking, thus obviating the need for further relief. Well, you know, there are rules as to retroactivity, but they, as I understand it, generally apply where they are diminishing the rights of those entering into contacts with the government. Here, this would benefit the rights, I mean, expand the rights of those. Is there any case that deals with that kind of situation? Well, we read Bowen against Georgetown, although it did deal with the case that disadvantaged private parties, the Supreme Court... Is there any case that advantaged the person dealing with the government? No. I mean, what the district court attempted to do here was very unusual, and I think there are two separate analytical errors in the district court's retroactivity ruling. The first was the court proceeded from the premise that the Department of Agriculture had never before authoritatively interpreted the statute, and that's not correct. In this very proceeding, before the agency, the Department of Agriculture said that the language of the statute, which simply calls for recapture to be based on the appraised value, simply calls for an appraisal, including any improvements that have been made. That interpretation was expressed during a formal adjudication, and so it's entitled to deference under Chevron. Now, the district court declined to give effect to that agency interpretation. It didn't say, however, that it was contrary to law, or could it have done so, because it was consistent with the statute, and it didn't hold that it was arbitrary and capricious. Well, it wasn't the purpose of the statute to help the farmers, and wouldn't it be a tremendous disincentive to make capital improvements or keep up the value of the land if they were not to get any credit for it? There would be. That's correct. That incentive would be created. But looking at the purpose of the statute, why wouldn't you allow them to get credit for it? Well, that was one purpose of the statute. Obviously, the statute also served the purpose of helping the government to recover on loans that had been taken out by farmers and on which the farmers were delinquent. So part of what Congress was concerned about was the government's recovery on the loans, and the Secretary's first interpretation better served that purpose. The later interpretation better served the purpose Your Honor has identified. But the point is both interpretations were consistent with the statute, and the Secretary's subsequent adoption of another interpretation doesn't compel her to apply that retroactively. Under Bowen, there are two conditions that have to be satisfied for regulatory retroactivity. First, Congress has to have clearly given the agency the authority to promulgate a retroactive rule. And secondly, the agency has to have clearly stated that its rule will be retroactive. And here we have the exact opposite. The agency explicitly considered the question of whether to apply its new rule to cases where appraisals had already been done. And it determined that the administrative difficulty of reopening what could be as many as 5,000 cases was not justified. And the district court simply didn't address that policy decision that the agency made. Well, can you explain that? Everybody keeps saying about reopening these 5,000. Would there be a mandatory requirement to reopen those that were essentially closed already? There is an administrative procedure for reopening, seeking to reopen an appraisal. And what is the time frame for reopening? I'm not certain of that. Would that make a difference as to whether 5,000 would really be reopened or not reopened? Yes, although all of this took place within a fairly short time period because the Agricultural Credit Act was in 1987, so the agreement started expiring in 1997. This rule change came just a couple of years after that. With respect to your jurisdiction argument, although we, of course, can't create or take jurisdiction where we have none, it just seems sort of an anomaly here given the nature of everything that's before the court that we couldn't invoke some of these principles of practical finality that have been mentioned in various cases and take jurisdiction over the whole thing and decide both appeals. Why shouldn't we do that? We recognize, as we said in our brief, that the interests of judicial economy probably would be better served by resolving all of these issues at once. Nonetheless, we think the application of the final judgment rule here is fairly clear and that the Supreme Court in Swint considered a very closely analogous question and decided that when you have a judgment that is not final and you have one party that can appeal under the collateral order doctrine, that does not give the Court of Appeals pendant jurisdiction over claims brought by the other parties. If this Court does reach the merits of the Polly's appeal, it should affirm the judgment of the District Court. Under the shared appreciation agreement that the Polly's signed, which was in consideration for a write-down of $130,000 in their debt that they owed to the Department of Agriculture and on which they were delinquent, they agreed to repay 50% of the appreciation in the value of their property over the term of the agreement. As both the Seventh Circuit in Israel and the Eighth Circuit in Stahl concluded that the language of the agreement is plain and it compels repayment at the end of the term. Even if the agreement were ambiguous, it should be interpreted so as to make it consistent rather than inconsistent with the authorizing statute, which also clearly provides for recapture at the end of the term. As to the Polly's clear claim of estoppel, as this Court recognized in S&M investment, estoppel against the government is available only in the most unusual circumstances and requires, among other things, affirmative misconduct going beyond mere negligence. Now, as the district court pointed out, the evidence presented by the Polly's here demonstrates negligence at best, and perhaps from all of the affidavits and testimony that they presented, it demonstrates negligence on the part of several different officials. They may have shown that many people in the department were confused about the agreement, but there's no evidence at all that anyone set out deliberately to mislead people. And, of course, in order to survive a motion for summary judgment, it's their burden to produce some evidence of that, and they fail to do so. How could you have such mass delusion going on? I mean, there seems to be enough of these claims floating around that these representations were made, that one has to believe that they actually were made, that people were being told this, thousands upon thousands of people. How could you have an agency? I mean, I can sort of understand, you know, the guy calls up, talks to somebody on the phone about federal cop insurance, and gets a particular employee on the phone, and, you know, gets bad advice, and it's too bad for him, and he gets stuck. But it's a little bit different, or just pushes the envelope just a little farther, to have this kind of advice given on a mass basis, apparently, by scores of hundreds of thousands of agents all over the country. You know, one guy can make a mistake, but if a bunch of people at the same time in different parts of the country all are saying the same thing, it does suggest more than simple error. It suggests some sort of policy at a higher level in the command structure. Well, I mean, I think no one would question that the agency probably could have done a better job here. But all of this took place... I think the doubt is whether they could have done a worse job. I think that's the more critical question. I mean, it's important to consider the context here, which was that there were widespread foreclosures. Congress had created the Agriculture Credit Act, which provided for a number of different kinds of programs to try to help with debt servicing. There were different programs that had similar but distinct requirements. I think Mr. Downing testified before the district court that some of the officials were confused about what the requirements were for one program versus the other. There were some programs that did not require repayment at the end of the term. But there was evidence in the record that they wanted to get these... Let's get rid of these claims. You've got these masses of claims. So let's tell them there's going to be no recapture. Well, there was certainly evidence that the agency...  Although there's evidence that the agency wanted to process these cases quickly, which is entirely appropriate, there's no evidence that in an effort to get the cases resolved quickly, the agency made a decision to mislead people. There's nothing at all that would suggest that. There's nothing that suggests, tell them there'll be no recapture so we can get rid of all of these cases? Even though we know that it's false, no. No. The polis haven't presented any evidence that anyone set out to mislead. Are there a lot of these things in different parts of the country and repeated often, at least that's what's in the claims, as to suggest some sort of directive from inside the agency that came from a fairly high level? These are people making mistakes. I can sort of see an agent getting confused between programs, but it sounds to me like this was more widespread than that. And if one wanted to get really suspicious, one could say maybe they wanted to get the farm state senators and congressmen off their back, so maybe it was directed to placate the farmers and let the future take care of itself, but at least we'll avoid all of this devastation of the time. We'll avoid having these disgruntled farmers calling their representatives against us in Washington. I sort of have that feeling that they're making a movie of it. Again, to the extent that the evidence suggests some centralized directive, there's no reason to suppose that the central officials who issued the directive were doing it deliberately rather than trying to infer that they were simply confused themselves. The case came up on a motion for summary judgment, correct? That's correct. And was there any discovery into the genesis of this mass confusion? No, and the plaintiffs didn't seek any discovery. And there's no Rule 56F motion for discovery or stating off the summary judgment motion? No. So basically the evidence would have to be an inference from the timing, is that correct? That's correct. Again, timing that's equally consistent with widespread error. You're not taking the position that this is a tucked-back claim that really belongs in the court of federal crimes, are you? No, we're not, Your Honor. They are seeking a recoupment. Or at least I don't know whether in this case or in the other case they are. Maybe you can't speak to that. Well, as I understand their claims, even if the court were to accept all of their claims, it would mean that they did not owe the government any money. There's no theory under which the government would owe the police money under the contract. And that's one reason why, since there's no money-mandating provision in the statute or in the contract, why this isn't a little tucker act claim. The second would be in this case. It wouldn't be a little tucker act. It would be a big tucker act. $10,000? That's correct. There were some claims in the district court for money damages on the contract, which the district court dismissed on precisely that theory, that any claims for contract damages would be after. There was this complaint? Yes. Why wasn't the correct remedy to send it to the court of federal claims rather than dismiss? Oh, as a transfer under? Well, if you have got, I mean, it's very clear that you've got mixed claims. You've got tucker act and non-tucker act claims together. You've got to send the whole case. I guess they can dismiss voluntarily, I suppose. That's correct. And to my knowledge, the plaintiffs never sought a transfer to the court of federal claims. Unless there are any questions. Okay. Thank you. Thank you. You are out of time. Cases on you will be submitted. We'll next hear on you. In the Ghana case.
judges: D Nelson, Kozinski, McKeown